Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.

ATTORNEYS FOR APPELLANTS:

**KURT A. YOUNG**
Nashville, Indiana

**E. PAIGE FREITAG**
Jones, McGlasson & Benckart, P.C.
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**RICHARD S. KOSMALA**
Indiana Department of Child Services
Nashville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED
Dec 14 2012, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE )
TERMINATION OF THE PARENT- )
CHILD RELATIONSHIP OF: )
)
M.S. AND M.T. (MINOR CHILDREN) )
AND )
A.H. AND T.S., )
) No. 07A04-1204-JT-217
Appellants-Respondents, )
)
vs. )
)
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
)
Appellee-Petitioner. )

APPEAL FROM THE BROWN COUNTY CIRCUIT COURT
The Honorable Judith A. Stewart, Judge
Cause Nos. 07C01-1109-JT-0053 and 07C01-1109-JT-0054

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

A.H. ("Mother") and T.S. ("Father") appeal the involuntary termination of their parental rights to their respective children, claiming there is insufficient evidence supporting the trial court's judgment. We affirm.

**Facts and Procedural History**

Mother is the biological mother of M.T., born in August 1999, and M.S., born in August 2008 (collectively referred to as "the children"). Father is the biological father of M.S.[1] The facts most favorable to the judgment reveal that in May 2010, the local Brown County office of the Indiana Department of Child Services ("BCDCS") was notified that the children had been taken into emergency protective custody by local police officers. On the day the children were removed, M.T. was not picked up from the school bus stop and, after several unsuccessful attempts to reach the parents by telephone, a neighbor took M.T. home. Upon arrival at the family home, the neighbor was unable to awaken either parent and thereafter telephoned local law enforcement.

When police officers arrived, M.T. and then one-year-old M.S. were observed playing alone and unsupervised in the backyard. The police were unable to awaken

---

[1] For clarification purposes, we note that the parental rights of M.T.'s biological father, J.T, were not terminated by the trial court in its April 2012 termination order. Consequently, J.T. is not a party to this appeal. We therefore limit our review and recitation of the facts to those pertinent solely to Mother's appeal regarding the termination of her parental rights to both M.T. and M.S., and Father's appeal pertaining to the termination of his parental rights to M.S.

either parent despite beating on the doors. When the parents eventually answered the door approximately two hours later, they were informed that the children had been taken into protective custody. The children were later placed with the maternal grandmother.

During its investigation of the matter, BCDCS requested that both parents submit to a drug screen. Test results indicated that Mother tested positive for methamphetamine, and Father tested positive for oxycodone. Father, however, produced a valid prescription for the drug, which was prescribed to address his chronic pain from injuries sustained in a motorcycle accident that had occurred several months earlier.

Several days following the children's removal from the family home, BCDCS filed petitions under separate cause numbers alleging M.T. and M.S. were children in need of services ("CHINS"). At the same time, BCDCS also made arrangements for the children to be returned to the family home on a trial home visit so long as the parents (1) had a landline phone service installed within ten days to allow for regular communications with BCDCS, (2) submitted to random drug screens and not produce any positive results for illegal drugs or controlled substances that were not prescribed, and (3) continued to participate in court-ordered provisional services. Due to positive drug screens by the parents for methamphetamine, however, the children were never allowed to return home.

Meanwhile, M.T. and M.S. were adjudicated CHINS in September 2010. Following a hearing in December 2010, the trial court issued dispositional orders formally removing M.T. and M.S. from both parents' care and custody and making the

3

children wards of BCDCS. The court's dispositional orders also directed Mother and Father to participate in and successfully complete a variety of services designed to improve their parenting abilities and to address their respective substance abuse issues in an effort to facilitate reunification of the family. Among other things, the parents were ordered to: (1) complete a drug and alcohol assessment and follow all resulting recommendations; (2) refrain from using any illegal or controlled substances without a prescription and provide a copy of all valid prescriptions to BCDCS; (3) submit to random weekly drug screens; (4) exercise regular supervised visitation with the children and transition to less restrictive visits; (5) attempt a trial home visit within thirty days from the dispositional hearing; and (6) sign a release of information for all service providers and agencies.

Both parents' participation in court-ordered services was inconsistent and ultimately unsuccessful. After months of delay, the parents eventually completed substance abuse evaluations, after which it was recommended that both parents participate in intensive out-patient treatment programs ("IOPs"). Because Brown County does not offer an IOP and the parents would have had difficulties traveling to a neighboring county for the recommended services, BCDCS allowed the parents to have an alternative treatment plan including individual therapy, parent aid, and a relapse prevention program in Brown County.

It took Mother five months to complete the twelve-week relapse prevention program through Centerstone. In addition, Mother's participation was deemed

4

unsuccessful because she was "coming to class high," regularly fell asleep during group sessions, refused to participate in Alcoholics Anonymous meetings, and failed to obtain a sponsor. Tr. p. 170. Father's attendance in the relapse prevention program was similarly sporadic and unsuccessful. Father also attended group therapy intoxicated and fell asleep during sessions on a regular basis. Although Father's treatment was later modified to specifically address his issues of dealing with chronic pain management, he attended only three or four of the required addiction-free pain management classes. In addition, both parents refused to consistently participate in the homemaker parent aid services designed to assist the parents with employment, housing, public assistance, and budgeting. These services were eventually closed as unsuccessful.

As for individual therapy, therapist Rick Thatcher was enlisted to provide weekly in-home individual therapy initially for Father, and then later for both parents. Between May 2010 and December 2011, the parents attended approximately fifty-four percent of their scheduled appointments. Additionally, both parents continued to test positive for illegal and controlled substances. Specifically, Mother tested positive for oxycodone, hydrocodone, or diazepam on approximately thirty-three drug screens during the CHINS case. Mother also tested positive for methamphetamine twice in May 2010, once in November 2010, and once in June, August and September 2011.

Father likewise had thirty-five positive drug screens during the CHINS case, including positive screens for methamphetamine once in September and December 2010, twice in May 2011, once in August 2011, and twice in September 2011. In addition, both

parents were unavailable for approximately half of the total requested drug screens, and on several additional occasions, both parents were available but refused to participate in requested drug screens. As for visitation with the children, a second attempt for a trial home visit was again prevented due to more positive drug screens from the parents. Consequently, visits never progressed past being fully supervised.

In August 2011, the maternal grandmother died and the children were placed in relative foster care with the sister of M.T.'s biological father. The parents experienced a brief period of improvement and compliance with service providers, but within weeks their participation in services began to wane. BCDCS filed petitions seeking the involuntary termination of Mother's and Father's parental rights to M.T. and M.S. in September 2011. Amended termination petitions were filed later the same month. Although BCDCS made referrals, at the request of the parents for more intensive services, for both Mother and Father to participate in an IOP in Columbus, Indiana in November 2011, both parents failed to show and participate in the program.

A consolidated evidentiary hearing on the termination petitions was held in March 2012. During the termination hearing, BCDCS presented substantial evidence concerning both parents' significant history of substance abuse and ongoing struggles with addiction. Specifically, BCDCS introduced evidence showing Mother had failed to successfully complete the recommended IOP, parent aide services, and individual therapy. Mother also had several pending drug-related charges, including possession of methamphetamine, for offenses committed during the pendency of the underlying

6

proceedings. Similarly, BCDCS presented evidence establishing Father was currently incarcerated on pending criminal charges, continued to struggle with his addiction to prescription pain medication, and failed to complete both the recommended IOP and addition-free pain management programs. Finally, BCDCS presented evidence establishing that the children were living together and thriving in a pre-adoptive relative foster care.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In April 2012, the trial court entered its judgment terminating both Mother's and Father's parental rights to M.T. and M.S. This appeal ensued.

**Discussion and Decision**

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's and Father's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005).

7

First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

      (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

8

> (ii)    There is a reasonable probability that the continuation of the  parent-child relationship poses a threat to the well-being of the child.
>
> (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)    that termination is in the best interests of the child; and
>
> (D)    that there is a satisfactory plan for the care and treatment of    the child.

Ind. Code § 31-35-2-4(b)(2).[2]  "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Mother and Father challenge the sufficiency of the evidence supporting the trial court's conclusions as to subsections (b)(2)(B) and (C) of the termination statute cited above.  See I.C. § 31-35-2-4(b)(2).

## I. Conditions Remedied

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights.  See L.S., 717 N.E.2d at 209.  Because we find it to be dispositive, we limit our review to

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

Mother's and Father's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether BCDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of M.T. and J.S. outside the parents' care will not be remedied.

When making a determination as to whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, BCDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, BCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable

probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Although Mother acknowledges on appeal that (1) she has a substance abuse problem involving "principally painkillers and, occasionally methamphetamine," (2) "[s]everal test results" indicate "continued use," and (3) she was arrested for possession of methamphetamine during the underlying proceedings and these charges remained pending at the time of the termination hearing, she nevertheless insists that her "renewed interest in an IOP program" and past ability to be "a good mother even though she suffered from an addiction to drugs" established that she will eventually "deal successfully with her addiction." Appellant Mother's Br. at 15, 17. Father asserts that although he "did slip into occasional use of methamphetamine during the seventeen-month period [BCDCS] performed drug screens on him," the testimony also established that he "participated in and cooperated with the services BCDCS provided" and that he "loves and deeply cares for M.S." Appellant Father's Br. at 6. Both parents therefore contend that the trial court committed reversible error in terminating their parental rights.

Here, the trial court made numerous detailed findings in its judgment regarding both parents' unresolved struggle with substance abuse, ongoing parenting issues, and pending criminal charges. In so doing, the trial court specifically found Mother and Father remain "heavily addicted to drugs, in particular methamphetamine" and that this addiction has "rendered the parents unable to adequately care for the children." Appellant Father's App. p. 12. The court also found, "Neither parent has been able to overcome

11

[their] debilitating drug addiction during the course of the CHINS proceedings and these [termination] proceedings, and each of them continues to use methamphetamine." Id. The court went on to note that the individual therapy and homemaker parent aid services offered to both parents were "not successful due to the parents' lack of cooperation," and that both parents were observed as being "intoxicated" during therapy sessions "as shown by their lack of focus, unclear thought process[es,] and falling asleep." Id. Moreover, the court specifically found that BCDCS provided Mother and Father with many services which, if utilized, "would have alleviated the reason for removal," but that the parents had been "unwilling to take advantage of those services" and "repeatedly displayed a lack of motivation in meeting the requirements of the dispositional order." Id. at 13-14.

Based on these and other findings, the trial court concluded that there is a reasonable probability that the conditions that resulted in the removal of the children or the reasons for continued placement of M.T. and M.S. outside the parents' care will not be remedied. A thorough review of the record leaves us satisfied that clear and convincing evidence supports the trial court's findings cited above. These findings, in turn, support the court's ultimate decision to terminate Mother's and Father's parental rights to both children.

During the termination hearing, it was the overwhelming consensus of case managers and service providers that Mother and Father had made little or no progress with their respective substance abuse issues and/or ability to provide the children with a safe and stable home environment. Specifically, therapist Betty Barr ("Barr") informed

12

the trial court that despite Mother's eventual completion of the relapse prevention program at Centerstone, Mother's participation had been "unsuccessful" because she continued to use drugs throughout her involvement in the program and had "failed to show" any "self-awareness" or "insight" into her addiction problems. Tr. p. 96. Barr further testified that both parents had been observed to be "under the influence" while participating in group therapy sessions and that Father attended only three or four of the required pain management classes. Id. at 98.

Therapist Rick Thatcher likewise confirmed that both parents had been observed as "having difficulty focusing," "falling asleep," and fading "out and back" during individual therapy. Id. at 120. Parent Aid Roxanne Collier testified that both parents "missed a little over half" of their scheduled in-home parent aid sessions, appeared "impaired" and oftentimes could not stay awake during scheduled sessions, and were eventually discharged from the program as unsuccessful due to "[n]on-compliance." Id. at 151. Finally in recommending termination of Mother's and Father's parental rights, BCDCS case manager Rae Dickerson ("Dickerson") informed the trial court that none of her concerns regarding the parents' struggle with drugs had been relieved. Dickerson further testified that she was never able to recommend returning the children to either parents' care due to lingering safety concerns revolving around the parents' unresolved substance abuse issues, explaining that in "almost two (2) years" the parents made "little to no progress towards maintaining any sort of sobriety for any period of time." Id. at 179.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). After reviewing the record, we conclude that BCDCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability the conditions leading to M.T.'s and M.S.'s removal and/or continued placement outside of both Mother's and Father's care will not be remedied. The parents' arguments to the contrary amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265. Accordingly, we find no error.

## II. Best Interests

We next consider Mother's and Father's assertions that BCDCS failed to prove termination of their parental rights is in M.T.'s and M.S.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the

14

evidence. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several additional pertinent findings and conclusion relating to children's best interests. Specifically, the trial court noted that by their own admission, both Mother and Father "still have not addressed their substance abuse of methamphetamine[] or prescription pills." Appellant Father's App. p. 13. The court also found that the children need "care and supervision which cannot be provided by parents who use methamphetamine and prescription drugs to the extent that they cannot remain conscious under circumstances where it is obvious that the counselor observing such behavior will report his or her behavior to the court." Id. at 4. These findings, too, are supported by the evidence.

During the termination hearing, Mother and Father both testified that they had not benefitted from their participation in the relapse prevention program. Father described it as a "waste of my time." Tr. p. 67. Father further testified that he felt individual therapy with Thatcher "was a joke," and that he quit attending sessions because he did not "think

15

[Thatcher] does his job properly." Id. Mother acknowledged that she continued to use drugs during treatment and was currently using methamphetamine "roughly speaking" every two weeks. Id. at 27.

In recommending termination of Mother's and Father's parental rights as in the children's best interests, both case manager Dickerson and Guardian ad Litem ("GAL") Sallyann Murphy ("Murphy") confirmed that neither parent had resolved their respective addiction issues and that both M.T. and M.S. were "doing very well" in their current pre-adoptive relative foster home. Id. at 180; 200. GAL Murphy further informed the trial court that she believed the children deserved to be in a safe and secure environment where they could be the "center of attention" and have adults who were "concentrating on them" rather than "their parents who've been the center of attention for so long." Id. at 203.

Based on the totality of the evidence, including both parents' unresolved substance abuse issues, employment instability, pending drug-related criminal charges, and failure to successfully complete a majority of the court-ordered reunification services, coupled with the testimony from case manager Dickerson and GAL Murphy recommending termination of the parent-child relationships, we conclude that there is sufficient evidence to support the trial court's determination that termination of Mother's and Father's parental rights is in M.T.'s and M.S.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (stating that testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued

16

placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), <u>trans. denied</u>.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." <u>In re A.N.J.</u>, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting <u>Egly v. Blackford Cnty. Dep't of Public Welfare</u>, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

VAIDIK, J. and BARNES, J., concur.